# NO. 12-16-00185-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 258TH* |
| *A.M., A.M., & C.M.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *TRINITY COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

J.M. appeals the termination of his parental rights. In one issue, he challenges the trial court's termination order. We affirm.

## BACKGROUND

J.M. and M.M. are the parents of A.M., A.M.1, and C.M.[1] On August 5, 2015, the Department of Family and Protective Services (the Department) filed an original petition for protection of the children, for conservatorship, and for termination of J.M.'s and M.M.'s parental rights. The Department was appointed temporary managing conservator of the children, and the parents were allowed limited access to, and possession of, the children.

At the conclusion of the trial on the merits, the trial court found, by clear and convincing evidence, that J.M. had engaged in one or more of the acts or omissions necessary to support termination of his parental rights under subsections (D) and (E) of Texas Family Code Section 161.001(b)(1). The trial court also found that termination of the parent-child relationship between J.M. and the children was in the children's best interest.[2] Based on these findings, the

---

[1] The oldest two children have the same initials. Therefore, we will refer to the oldest child as A.M. and to the younger child as A.M.1.

[2] A presumed father of the children, T.P., signed an affidavit of voluntary relinquishment of parental rights on April 20, 2016.

trial court ordered that the parent-child relationship between J.M. and the children be terminated. This appeal followed.

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action "permanently sunders" the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the second subsection of the statute. TEX. FAM. CODE ANN. § 161.001(b)(1) (West Supp. 2016); *Green v. Tex. Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2016); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014). The burden of proof is upon the party seeking the deprivation of parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted with both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619

S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## BEST INTEREST OF THE CHILDREN

In his sole issue on appeal, J.M. challenges the legal and factual sufficiency of the evidence to support a finding that termination of his parental rights is in the children's best interest. In determining the best interest of the child, we consider a number of factors, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

The family code also provides a list of factors that we consider in conjunction with the above-mentioned *Holley* factors. *See* TEX. FAM. CODE ANN. § 263.307(b) (West Supp. 2016).

Those statutory factors include (1) the child's age and physical and mental vulnerabilities; (2) the magnitude, frequency, and circumstances of the harm to the child; (3) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (4) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (5) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (6) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (7) whether the child's family demonstrates adequate parenting skills; and (8) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b)(1), (3), (6), (8), (10), (11), (12), (13).

The evidence need not prove all statutory or *Holley* factors in order to show that termination of parental rights is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *In re J.I.T.P.*, 99 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2003, no pet.). In other words, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the child's best interest. *In re M.R.J.M.*, 280 S.W.3d 494, 507 (Tex. App.—Fort Worth 2009, no pet.). But the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Evidence supporting termination of parental rights is also probative in determining whether termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 28-29. We apply the statutory and *Holley* factors below.

**The Evidence**

The record shows that the current investigation was the third investigation by the Department regarding J.M.'s family. During the first investigation in 2007, one of the children was removed from the home. The parents had problems with drug use, domestic violence, and unsanitary home conditions. The child was eventually returned to the home. The second investigation resulted when the Department received a report of domestic violence between the parents. Both parents were arrested and the children were placed in foster care. The parents completed their service plans and the children were returned to their parents.

The third, and current, investigation began in August 2015 when A.M. was eight years old, A.M.1 was four years old, and C.M. was three years old. Brenda Snyder, a Department supervisor and investigator, testified that law enforcement requested her assistance after conducting a raid on M.M.'s and J.M.'s house. Law enforcement told her that they found the house to be in a "deplorable" condition, that drugs, including K2 or synthetic marijuana, were in the house, and that a man was present who had been ordered not to be in the house. Snyder went to the residence, spoke to the parents and children, and went inside the house. She said that the children were "filthy," had lice, and were covered in animal feces. A.M. stated that she witnessed M.M. and J.M. fighting, saw J.M. hit M.M. in the face, and knew that drugs were in the house. Snyder also stated that A.M.1 appeared to be behind in her speech.

Snyder described the conditions of the house as being "[v]ery unsafe" for children and a danger to their physical and emotional wellbeing. Only the living room and kitchen had electricity. She said the house had no running water. On the kitchen countertop, Snyder saw an ashtray that was overflowing with tobacco and "blunts" (cigars with marijuana substituted for the tobacco). Most of the food in the house was uncovered and roaches were "sliding" across it. The kitchen was unsanitary with a pile of dirty dishes in the sink and roaches on the countertop. The house smelled like dog feces, bags of garbage were lying around, mold was present throughout the house, and there were holes in the ceiling of one of the rooms. Snyder stated that she had to walk over clothes to enter the bedrooms. The bathrooms were "bad" and the bedrooms contained a total of two beds. One mattress had no linens and was "very filthy." Snyder admitted that some of the household items could have been strewn about because law enforcement searched certain areas of the house. However, she said there was prior dirt and filth farther into the house.

Jeffrey Dean, a Trinity Police Department officer, testified that he stayed with the children while law enforcement searched the house. He stated that the children were "filthy," scratched a lot, and had feces on their clothes. He discovered an ashtray filled with cigarette butts and marijuana "roaches," or paraphernalia, under the couch within the children's reach. Dean stated that A.M. attempted to eat some ice cream from the freezer. She used her hands to scoop and eat the ice cream which contained what Dean believed to be flies. A.M. told Dean that the flies were "chocolate chips." He took the ice cream away from A.M. Dean also stated that a cat was in the house and appeared to be "barely living." A.M. fed the cat with her hands,

from a bucket that had a "toxic" sticker on its side and cockroaches crawling inside it. Dean believed that the house was unsanitary and a health danger. Dean was also concerned about the children's psychological wellbeing. He said that A.M. described how to make a cigarette, telling him that her parents emptied the tobacco from cigars or cigarettes, placed synthetic marijuana inside, and smoked them. A.M. and A.M.1 told him that they went on "family trips" whenever their parents ran out of cigarettes, or as described to him, synthetic marijuana. He and Snyder stated that the children were not sick and did not appear to be malnourished.

J.M. explained that the house was in "pretty bad shape" because he, M.M., and the children had been at the beach for three days and had been home approximately twenty minutes before law enforcement arrived. M.M. blamed the state of the house on her house sitter, a seventeen year old boy. J.M. stated that the ashtray full of cigarettes was present because he, J.M., was a smoker. He admitted that one of the bathrooms was not working, but that the master bathroom was in working condition. J.M. stated that the missing sheetrock and holes in the ceiling was new and could have been caused by rain that weekend. Although M.M. claimed that C.M.'s diarrhea was the source of the feces on the children's clothing, J.M. gave no explanation for it.

Snyder stated that she placed the children in foster care after each child received a bath, lice treatment, and new clothes. Eventually, the children were placed with their paternal grandparents. Don Walker, Ph.D., a licensed psychologist, stated that he conducted psychological evaluations on J.M., A.M., and A.M.1. He diagnosed A.M. with (1) adjustment disorder with disturbance of emotions and conduct, and (2) suspected child neglect. Her suggestive intelligent quotient was in the average range, but her word recognition rate, spelling, and reading tests were below kindergarten level. Dr. Walker recommended therapy, counseling, and academic assistance. Dr. Walker diagnosed A.M.1 with adjustment disorder with mixed disturbance of emotions and conduct.

Dr. Walker diagnosed J.M. with (1) bipolar disorder, "occurrence, severe, and depressed;" (2) probable psychiatric discrepancies; (3) adjustment disorder with anxiety; and (4) some personality disorders with histrionic and antisocial traits. He recommended counseling, psychotherapy, medications, and treatments for anxiety. According to Dr. Walker, J.M. stated that he had been diagnosed with intermittent explosive disorder. He also told Dr. Walker that he often felt angry and irritable, made suicidal threats, and attempted suicide. Dr. Walker stated that

personality disorders were extremely resistant to treatment and the probability of successful treatment was remote. At trial, J.M. denied being diagnosed with bipolar disorder, but admitted taking antidepressants.

J.M. and the children participated in counseling. The counselor has seen A.M. and A.M.1 twice per month since August 2015. The girls were making slow progress in behavior and communication skills. A.M. was "very, very" protective, did not want to say the wrong thing, and claimed that she was not supposed to say certain things. Both girls displayed some learned behavior that was inappropriate by community standards, such as watching movies that they believed to be age appropriate, but which were not. They also discussed some activities that they saw their parents participating in, such as fighting and arguing. The counselor testified that the girls behaved well in school and performed well academically. However, their paternal grandparents had problems with the girls respecting authority. She testified that the children loved J.M.

The counselor said that J.M. completed six sessions, showed good restraint, and was calm. He discussed having anger issues and a strong support system. The counselor's goals for J.M. included finding and maintaining a safe and hazard free environment for his children and being able to protect them. He seemed to be making progress and was very good at providing feedback. However, J.M.'s caseworker informed the counselor of an incident in which J.M. displayed anger outside of their sessions. The counselor asked J.M. to attend further sessions and he attended one additional session. The counselor testified that J.M. minimized his display of anger, was not happy to continue counseling, and never returned. The counselor testified that she could not recommend that the children be returned to J.M.'s custody given his failure to complete counseling and his inability to apply the skills that he had learned.

Katy McMahon, the CASA ad litem supervisor, testified that she visited with the children numerous times. She stated that the children are doing well and that their current placement was safe, appropriate, stable, and in their best interest. The counselor believed the girls were happy with their current placement. Jeremiah Johnson, the CASA advocate, testified that it was in the children's best interest to be placed with their paternal grandparents. He needed more evidence before he could recommend that J.M.'s parental rights be terminated.

Johnson stated that J.M. appeared "standoffish" when he visited the children. He said that J.M. seemed really nervous, kept smoking cigarettes, and had a hard time interacting with

the children. The children's counselor testified that, at the time of trial, the girls were concerned because J.M. had not been attending visitations. They questioned where he had been and when he would return. In contrast, J.M. testified that he visited the children when he was allowed to do so, and never missed a scheduled visitation. He said that he visited the children twice a month, called them three times a week, and last visited them two weeks before trial.

J.M. testified regarding his criminal record, drug tests, current home, employment, and transportation. He denied being convicted of or indicted for an offense, or failing a drug test, since August 2015. He lived in the same house from which the children were removed. However, J.M. maintained that the house has been completely remodeled. He offered pictures of the remodeled house, including the pantry, laundry room, bathroom, and kitchen. J.M. stated that his mother owns the house, he has a verbal lease agreement, and he pays the utilities, but no rent. He also explained that his current girlfriend and her child live with him in the house. J.M. stated that he provided his girlfriend's identification to the Department. J.M. testified that he was employed at Pilgrim's Pride in the shipping and labeling department. He had worked at Pilgrim's Pride for three weeks before trial, earned $9.00 per hour, and worked twelve-hour shifts. He stated that he has a vehicle, a driver's license, and car seats for the children. He admitted that his mother gave him the vehicle, but she retained the vehicle's title. J.M. also testified that he completed a parenting class.

## Conclusion

Viewing the above evidence relating to the statutory and *Holley* factors in the light most favorable to the trial court's best interest finding, we hold that a reasonable fact finder could have formed a firm belief or conviction that termination of J.M.'s parental rights is in the children's best interest. *See J.F.C.*, 96 S.W.3d at 266. The trial court could have determined that the conditions of the house in August 2015 were unsafe, unsanitary, and a danger to the children's physical and emotional wellbeing. Moreover, the trier of fact could have believed that J.M. smoked synthetic marijuana at the house, that at least one child knew how to make "blunts," and the children had access to the marijuana. The court could have also determined that J.M. had severe mental health issues, which he minimized, did not apply the skills learned in counseling, and did not interact well with the children. The trier of fact could have determined that J.M.'s employment was too new to offer stability for the children, and that he depended on his mother to provide housing and transportation. Finally, the Department supervisor recommended that

8

J.M.'s parental rights be terminated, and the CASA supervisor and counselor could not recommend that the children be returned to J.M. because it would be harmful or detrimental to them. In contrast, the CASA advocate stated that he needed more evidence before he could recommend that J.M.'s parental rights be terminated even though he did not believe it was in the children's best interest to be returned to J.M. He testified, however, that he had been a CASA volunteer for only four months, the children's advocate for only two months, and that he had attended only one visitation between J.M. and the children. Consequently, the trial court could have given greater weight to the testimony of the other witnesses who agreed that termination was in the children's best interest.

According to J.M., however, the children expressed a desire to have a relationship with him, placement with the grandparents adequately protected the children, and Johnson testified that he was not sure whether termination was in the children's best interest. This evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that termination of J.M.'s parental rights is in the best interest of the children. *See id*. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of J.M.'s parental rights is in the children's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). Accordingly, we overrule J.M.'s sole issue regarding the best interest of the children.

## DISPOSITION

Having overruled J.M.'s sole issue, we *affirm* the trial court's judgment.

**GREG NEELEY**
Justice

Opinion delivered December 27, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

9



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 27, 2016**

**NO. 12-16-00185-CV**

**IN THE INTEREST OF A.M., A.M., & C.M., CHILDREN**

Appeal from the 258th District Court
of Trinity County, Texas (Tr.Ct.No. 22,007)

THIS CAUSE came to be heard on the appellate record and brief filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*